case number twenty three ten sixty six Good morning, may it please the court. My name is Alan Bushlow. I'm with the law firm of Abbott, Bushlow and Schechner, and it's my privilege to appear before you this morning on behalf of Theodore James Adams, Jr., the plaintiff appellant. Your honors, the opinion of a treating physician must be given controlling weight if it is well supported and if it is not inconsistent with the other substantial evidence in the case. This treating physician rule has been the law in this jurisdiction for decades. It still applies in this case, and it was recently reaffirmed in decisions in which all of the judges on this panel have participated. Specifically, Hamilton versus the commissioner, Judge Carney was involved. I think there's no dispute that the treating we all are familiar with the rule, and we all are familiar with the fact that it continues to apply in cases that predate the effective date of the change in the rule and that this is such a case. Thank you. So in this case, the administrative law judge did not abide by that treating physician rule in that the opinions of Dr. Valentine, the claimant's treating psychiatrist who had treated him for four years prior to the hearing, were given little weight or slight weight in favor of the opinion of a non-examining agency doctor, Dr. Kleinerman, who is the only doctor to give opinion testimony in this case against a finding of disability, and Dr. Kleinerman's opinion cannot be substantial evidence under the Hidalgo case. Now, Doctor, if you look at the four Burgess factors, which are required in order to overrule the opinion of a treating physician, in this case, the frequency, length, nature, and extent of treatment, Dr. Valentine had been treating the claimant for four years, including prescribing numerous and, in fact, at the same time, very strong psychotropic medications. But only saw him, was it, once every several months for a half an hour? That's correct, Your Honor, but the duration was over four years. Because the duration and frequency is what is relevant, isn't it? He was managing the patient's psychopharmacological medication. Right, so he's not a therapist who is providing treatment other than the drugs during that period. He's verifying that there's still a need for medication and providing that medication. That goes perhaps to one of the factors, but in addition, his treatment notes are quite voluminous in terms of what happens at each session. He's very detailed. He's very precise and very particular about his findings at each visit. And his treatment notes, I mean, tend to generally describe Adams as stable or managing his anxiety and depression, don't they? And the kind of checkbox opinion at the end is somewhat in tension with those notes, and that was one of the bases for giving his opinion some weight. Well, I think the very nature of the treating physician rule, one has to assume that the treating physician is most familiar with their own treatment history of the patient. I think if you were to consider a situation, let's take a situation where you had a cardiologist who submits to the administrative law judge his tracings of an echocardiogram and writes in his decision that based on those tracings, a claimant has a particular cardiac condition. I think we would all agree that the administrative law judge would be stepping over appropriate bounds if they were to say, well, I understand that Dr. X interprets the EKG tracings as being consistent with this cardiac condition, but I've presided over 50 or 100 cardiac disability cases, and I don't read the EKG tracings that way. When you have a psychological case, it's tempting to treat it differently, but it's the same thing. For the ALJ to go through the treatment notes of the treating physician and to then say, you know what, I know that Dr. Valentine has been treating this patient for four years, and he wrote very detailed visit notes with each session, but I'm going to read the different facts that he's relayed in there, and I'm going to draw my own medical opinion based on those facts. It's the same thing as if you were reading an EKG tracing. Dr. Valentine and what the treating physician rule tells us is that Dr. Valentine, because of the treatment relationship, because of his expertise, because of his longitudinal familiarity with the patient, is best positioned to give us an opinion as to how he's doing. So when Dr. Valentine authors his evaluation in October of 2018, he's doing so on the basis of his longitudinal history with the patient. Regarding the fact that it's a check-the-box form, again, there's no per se rule against a doctor using a check-the-box form, especially when it's accompanied by their treatment notes and especially when it's done after a four-year period of treatment, as opposed to, for example, if a claimant were to go to a doctor for the very first time, there are no treatment notes and the doctor submits a check-the-box form. One could say, well, that's not very probative. Here it's backed up by all of the submissions of the doctor. Am I right that the check-the-box form is something, is that provided by the Social Security Administration? In this case, it was actually taken from the leading horn book on Social Security law by Mr. Hall. However, the irony here is when the claimant submits a check-the-box form, the government is quick to say, well, hey, that's a check-the-box form. But all of their doctors use check-the-box forms. In fact, Dr. Kleinerman uses the same form that is in every Social Security case and writes maybe a little tiny paragraph, which isn't even very expressive or explaining of why the findings of the treating doctor should be disregarded. The other thing about the question regarding- I just wondered whether, because I've seen this often, the argument made that it's a check-the-box form. If the Social Security Administration itself encouraged people to use this form or gave it to applicants that give this to your doctor, that would be sort of an entrapment kind of thing. But it's not quite that. It's a comparable form. The agency does use check-the-box forms at earlier stages of the proceeding. And indeed, in this case, the consultative examiner, Dr. Porcelli, wrote a report. And it's outside the record. But the fact of the matter is those reports essentially are done by clicking off macros on a computer program. And if you see enough of those reports from those consultative exams, they all follow the same exact rubric, and it's essentially a check-the-box form generated by a computer. It's interesting. These days, even the doctor's treatment notes- I'm not saying this was the case here, but even the doctor's treatment notes often come from that kind of computer program because the State Department of Mental Health encourages treatment providers to use that kind of computerized form, which provides that, and it becomes natural to just sort of click those things. It's efficient, and it also avoids omission because if they have to go through the rubric. But if we're going to criticize check-the-box forms here, the ironic thing is that if you look at Dr. Valentine's notes, they're anything but. They're custom for this patient. He clearly was thoughtful about his observations. And to address Judge Park's question about- It would be helpful, and I'm not suggesting that it's mandatory or that it defeats your argument in any way, but I've often thought when I'm looking at these, it would be helpful for the doctor to explain why he said marked on this or that. And we rarely get that from either side. But if we could only have the medical community cooperate in that way, I think everybody would be happy. We've got other things to do. To address Judge Park's question about some of the observations that Dr. Valentine makes, that Mr. Adams is doing well under certain circumstances, I do think that that's important to recognize that our case law, and we cite it in our brief, acknowledges this. Especially with mental health conditions, one would expect to see waxing and waning at various times. One also would expect that both the pros and the cons are noted by the doctor, and he does that. So while, yes, there are times where he's able to cook in the home and take care of his mother, there are also times where he says he goes to the grocery store and has a panic attack, or he can't drive because he's nervous, or he thinks that people are spying on him or following him. And that's the nature of mental illness. Nothing surprising there. And it's with the benefit of the waxing and waning in the four-year longitudinal history that Dr. Valentine had concluded in his evaluation and reports as he does. If we accept that Dr. Valentine's questionnaire, which he completed, is entitled to deference under the treating physician rule, then this claimant meets both Listing 12.04 and 12.06. The C criteria, we don't claim there's a B criteria met here, but the C criteria requires that the patient be undergoing ongoing medical treatment, mental health therapy, psychosocial supports, or a highly structured setting that diminishes the signs and symptoms. He's on his medication. He's following up with the doctor who's prescribed. He's being a compliant patient. He's also avoiding contacts with the community, basically staying at home with his family. One would expect him to be doing better, and the patient has no more than minimal capacity to adapt to changes in his environment. The issue here is not whether at home with his mother or after she passes away with his stepfather and avoiding contact with strangers he can do okay. The issue is once he tries to return to work and he has a boss that's giving him performance objectives and evaluating his work and he has to be on time and he has to be at his post and he has to be on task, how's he going to do in that context? And the very nature of the C criteria is that a patient who is undergoing ongoing psychological treatment and is being managed and has sort of found his safety zone is not going to be penalized because he's doing well in that controlled situation. The whole point of the C criteria is do we think this person would do well outside of their controlled situation? And Dr. Valentine has opined no. And by the way, Dr. Valentine's opinion is corroborated by Dr. Porcelli who also says that Mr. Adams' psychological problems may significantly interfere with his ability to function on a daily basis and that his prognosis is guarded. We do argue about the vocational witness not having adequate foundation. I would point out that if this court agrees that the listings are met, 12.04 and 12.06, we never get to vocational testimony because that's only relevant if we make it to those steps of the five-step sequential evaluation. Step three, if a claimant meets a listing, they're disabled and we don't go further. But if this court finds that we needed to get vocational testimony, when you ask a hypothetical to a vocational witness, it has to be supported by substantial evidence or else it's not of any use. Dr. Valentine opined in his report, among other things, that Mr. Adams would be markedly impaired in his ability to be in coordination with and proximity with others without being distracted by them. He opined that Mr. Adams was markedly impaired in his ability to interact with the general public, that he's markedly impaired in the ability to accept instructions and respond to criticism from supervisors, and that he's markedly impaired in the ability to get along with peers. When you then ask a vocational witness to assume that the claimant can perform simple, routine, repetitive work in an environment with few, if any, workplace changes and occasionally interact with supervisors, coworkers, and the public, I would submit that that's inconsistent. Somebody who's markedly impaired with their ability to interact with the general public can't tolerate occasional interaction. And so the entire hypothetical- I think we have your argument in this particular court. Thank you. You're reserved a few minutes for rebuttal. Thank you. We'll hear from the government. Good afternoon, Your Honors. I'm Anne Ziegler on behalf of the commissioner. Substantial evidence in this case supports the finding that Adams' mental impairments were not disabling. While his depression and anxiety resulted in significant mental limitations, and he could no longer perform his skilled master's degree-level work that he had performed for many years in the past, his mental impairments did not preclude him from performing less demanding, unskilled work. Giving some weight to each of the three opinions of record, including the opinions of the treating psychiatrist, Dr. Valentine, and examining psychologist, Dr. Porcelli, and the state agency psychiatrist, Dr. Kleinerman, the ALJ found that Adams was- limited Adams to simple, routine, repetitive tasks with few workplace changes, no more than occasional contact, interaction with supervisors, coworkers, and the public, no work involving direct customer service, and no tasks requiring teamwork. When evaluating the treating source opinion of Dr. Valentine, the ALJ discussed each of the required regulatory factors. First, the ALJ acknowledged the treating relationship and Dr. Valentine's specialization as a treating psychiatrist, whom, as you noted, generally saw Adams approximately every three months for 30 minutes at a time, with a seven-month gap in treatment between December 2016 and July 2017. The ALJ also considered the factor of supportability, finding that the marked limitations were not accompanied by any rationale or narrative explanation. In addition, the marked limitations were not supported by the doctor's own treatment records, which largely documented normal objective findings. Considering the supportability factor, the marked limitations were inconsistent with the consultative examination findings that were mostly normal, and the less restrictive opinions of Dr. Porcelli and Dr. Kleinerman. In addition, the marked limitations were inconsistent with Adams' demonstrated abilities, including his ability to care for his stepmother and his stepfather for a significant period, his ability to handle his mother's financial matters, organize her possessions, prepare her house for sale, and sell unneeded items on eBay. Also, his active search for work, including skilled management work, during the alleged period is inconsistent with the marked limitations. To be sure, the ALJ did not totally reject Dr. Valentine's opinion in favor of the non-examining state agency opinions. Rather, the ALJ gave some weight to each and incorporated significant limitations in the RFC to account for deficiencies in Adams' ability to adapt and interact with others. As required by the regulations, the ALJ articulated good reasons for not adopting the marked limitations assessed by Dr. Valentine. The decision complies with the legal standards and is supported by substantial evidence. The government asked the court to affirm the commissioner's decisions. If there is no questions from the court, the government will rest on its brief and ask the court to affirm. Thank you, counsel. You have reserved two minutes for rebuttal, Mr. Bushnell. Thank you, Your Honors. I'm not going to take anywhere near the full two minutes. Just on the point regarding Mr. Adams' caring for his family, this court has recently, as recently as last year in the Colgan decision, said that a claimant need not be a total invalid, and the fact that they can care for loved ones in a controlled setting does not necessarily mean they're not disabled. With that, we'll rest on our brief as well. Thank you. Thank you, counsel. Thank you both. We'll take the case and verify it.